UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| LEEQUAN MCLAURIN, | ) |
| | ) |
| **Plaintiff**, | ) |
| | ) |
| v. | )   **Case No.: 6:21cv00038** |
| | ) |
| LIBERTY UNIVERSITY, INC., | ) |
| | ) |
| **Defendant**. | ) |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff LeeQuan McLaurin worked for Defendant Liberty University, Inc. ("Liberty" or "the University") in various capacities from 2013 to 2020. Although McLaurin was never disciplined or discharged by Liberty, he ultimately resigned his employment after reaching a tipping point on his mounting philosophical dissatisfaction with Liberty's management. McLaurin used Liberty's social media accounts to endorse the Black Lives Matter movement, and he was directed by his supervisor to take down the post. Although Liberty's management explained that the post was taken down because it had not been properly authorized by executive leadership (and Liberty eventually did issue a similar statement). This episode immediately led to McLaurin's decision to resign.

Despite the obvious cause of McLaurin's resignation, he now claims that he was the victim of a calculated effort to push him out the door because he is Black, gay and Christian. He asserts various claims, including, hostile environment-constructive discharge and retaliation. His claims are premised on undisputed facts demonstrating that he unilaterally acted on his personal beliefs that often did not align with Liberty's institutional beliefs and his dissatisfaction with Liberty's refusal to immediately condone a Black Lives Matter position. Liberty's unwillingness to allow McLaurin to use his position to carry out his personal agenda does not amount to unlawful

discrimination, much less intolerable working conditions calculated to push him out.  Accordingly, summary judgment should be granted in Liberty's favor on all claims.

## I.    STATEMENT OF UNDISPUTED FACTS[1]

### a.  Liberty Is an Evangelical Christian University

Liberty is an equal employment opportunity employer that does not unlawfully discriminate on the basis of any protected class.[2]  (SF Decl. ¶10).  Liberty has policies to this effect in its Employee Handbook, which all employees are required to review at hire.  (SF Decl. ¶10).  As a private, religious institution, Liberty is also one of the largest Christian Universities in the world.  (SF Decl. ¶3). Liberty's stated mission is to "Train Champions for Christ," and it subscribes to a Doctrinal Statement that codifies it's religious beliefs.[3]  (SF Tr. 42-43; SF Decl. ¶¶4, 8).

Liberty's institutional beliefs affirm that marriage is between a natural born man and a natural born woman.  (SF Decl. ¶7).  It classifies same-sex marriage and sexual relations outside of a biblically ordained marriage, among other sinful conduct, such as drunkenness and lying,  as sinful.  (SF Decl. ¶7).  Despite its institutional beliefs, Liberty does not tolerate unlawful discrimination or harassment in any form, including not banning the hiring or requiring the termination on the basis of sexual orientation. (SF Tr. 60; SF Decl. ¶11).  "[E]verybody's welcome" at Liberty and is entitled to a safe and healthy environment, including students and employees of the LGBTQ+ community.  (GD Tr. 91-93, 110-12, 141-43).

### b.  McLaurin Joins the Office of Equity and Inclusion; Experiences Frustration

---

[1] **Exhibits incorporated are as follows:** Exhibit 1, Steve Foster Declaration; Exhibit 2, Greg Dowell Declaration; Exhibit 3, LeeQuan McLaurin Transcript; Exhibit 4, Foster (30b6) Transcript; Exhibit 5, Dowell Transcript; Exhibit 6, Justin Mercer Transcript (pending receipt from court report).
[2] It is undisputed that Liberty is a "religious organization" as defined by Title VII of the Civil Rights Act of 1964 ("Title VII").  *See* 42 U.S.C. §§ 2000e-1(a) and 2000e-2(e)(2). As such, it is exempt from Title VII insofar as it is permitted to hire and employ employees of a particular religion.
[3] Throughout the depositions, the parties used a version of the Doctrinal Statement that was updated after McLaurin's resignation.  The Doctrinal Statement in place at the time of McLaurin's employment is attached to Foster's Declaration (SF Decl. ¶8, Ex. B) and is the version Liberty references throughout this Memorandum.

McLaurin is a Black, gay Christian man who sought to attend Liberty because of its Christian mission. (QM Tr. 61, 71-72). McLaurin attended Liberty for his undergraduate degree, graduating in 2015 with a B.S. in Psychology. (QM Tr. 13-14). McLaurin worked in various capacities at Liberty before obtaining a position as the Associate Director of Student Engagement in July of 2018 in what was then known as Liberty's Office of Institutional Equity and Inclusion ("OIEI"). (QM Tr. 15-17, 24-25). OIEI provides programming and support to underrepresented students and other incoming students. (GD Tr. 52-57; QM Tr. 29-33, Ex. 1).

Shortly after joining the OIEI, McLaurin was informed that there would be some restructuring in the office. (QM Tr. 33-34). For instance, the office's name changed from the Office of Institutional Equity and Inclusion to the Office of Equity and Inclusion ("OEI"). (QM Tr. 35-36). McLaurin also took over some duties that were not expressly stated in his job description, such as participating in training students on the University's Title IX process, which was geared toward preventing discrimination on campus. (QM Tr. 36-40).

Over the next year, additional restructuring took place in the OEI and in the University's executive leadership. (GD Decl. ¶13). Greg Dowell, who was the University's Chief Diversity Officer and Vice President of Diversity, Equity, and Inclusion led the OEI. (QM Tr. 43, 46-47; GD Tr. 36, 56, 114; GD Decl. ¶4). The majority of the OEI staff were Black, including Dowell. (GD Decl. ¶12). Sometime after January 2019, the former OEI Executive Director, Melany Pearl, and McLaurin's supervisor, José Hernandez, departed from the University, leaving other employees, including McLaurin, to pick up some of their job duties. (QM Tr. 40-42; GD Decl. ¶13). McLaurin was frustrated, feeling like he was "holding two jobs at once." (QM Tr. 40).

### c. McLaurin Is Required to Plan and Attend a "Blexit" Event

In March of 2019, McLaurin was directed to plan a day trip to Richmond, Virginia for Liberty students to attend an event to feature Candace Owens, who is a controversial Black conservative speaker.  (QM Tr. 139-141).  McLaurin opines that Owens' event was geared toward trying to convince Black people to leave the Democratic Party and join the Republican Party, a process she refers to as "Blexit."  (QM Tr. 139-141).  McLaurin explained that this planning directive came from Dowell, who was passing along the directive from then-Liberty President Jerry Falwell, Jr..  (QM Tr. 143-44, 157; GD Tr. 148).  McLaurin "expressed [his] disdain" for Liberty's association with Owens, but understood this programming was part of his duties and organized the student trip.  (QM Tr. 144, 148-50, Ex. 4).

An email promoting this trip was mistakenly sent from McLaurin's email to the University as a whole, when it should have been sent from the OEI's general department email.  (QM Tr. 145-48; GD Decl. ¶17; JM Tr. Pending).  This angered McLaurin as it gave the impression that he was promoting this event.  (QM Tr. 147).  McLaurin described attending the event as painful and uncomfortable to watch.  (QM Tr. 150-56).  After attending the event, he felt like he "had to leave the University because they were just using [him] as a black face to get done what they wanted to get done, without [his] permission."  (QM Tr. 158-62).

### d.  Department Changes and Frustration Continue for McLaurin

In April of 2019, several OEI employees, including McLaurin, were asked to apply for promotions.  (QM Tr. 163-64, Ex. 5).  However, no immediate promotions were actually put in place as ongoing restructuring discussions occurred.  (GD Decl. ¶14).  The lack of transparency and slow process frustrated McLaurin, who was under the impression that if he performed particular job duties he would get a promotion.  (QM Tr. 163-64).  In light of this uncertainty, he began looking for employment outside of Liberty.  (QM Tr. 164-68, Ex. 6).

Changes continued early into 2020, and the promised promotions were finally coming to fruition.  (GD Decl. ¶18).  McLaurin got a new supervisor, Deputy Diversity Director Justin Mercer, who became the head of the OEI and reported to Dowell.  (QM Tr. 496-50; GD Decl. ¶18; JM Tr. Pending).  Dowell also got a new supervisor, Executive VP Ron Kennedy.  (QM Tr. 47; GD Tr. 50; GD Decl. ¶18).  In January, 2020, Dowell offered McLaurin and two of his colleagues (Samantha Newton and Jasmine McKinney) promotions.  (GD Decl. ¶19).  Specifically, Dowell offered McLaurin the title of Director of Diversity Retention with a salary increase to $52,000.  (QM Tr. 49-53; GD Decl. ¶¶19-20).  McLaurin, Newton and McKinney believed these offers were not consistent with the earlier promises that were made to them about promotions and they all declined the offers.  (QM Tr. 49-54, 182-83, Ex. 13; GD Decl. ¶21; Ex. B).

On January 20, 2020, McLaurin drafted a formal letter to Dowell, noting that the "offered salary, job title, and workload [were] not equitable."  (QM Tr. Ex. 13).  He argued that accepting an offer below what he believed was the appropriate pay grade would "contribute to pay disparities within the professional world for minorities," and that colleagues in similar positions at the University were making $13,000 higher than the $52,000 offered.  (QM Tr. Ex. 13).[4]

Following these letters, McLaurin met with Mercer, Dowell, and Kennedy.  (QM Tr. 169-71, Ex. 11).  Dowell recognized that he could not increase McLaurin's salary much without increasing the salary of Mercer.  (GD Tr. 168-70; GD Decl. ¶23).  Dowell was also trying to provide multiple employees with promotions within a limited payroll budget. (GD Decl. 22).  Regardless, Dowell advocated to his supervisor and Human Resources ("HR") for a higher salary

---

[4] McLaurin did not offer any citation for this alleged pay disparity, and there is no evidence in the record that it is true.

on behalf of McLaurin.  (GD Tr. 165-72; GD Decl. ¶22).  Kennedy explained to McLaurin that the offer made was the only offer on the table.  (QM Tr. 170; GD Tr. 171).

### e.  McLaurin Reaches Out to HR for Guidance About OEI Changes

Around January 22, 2020, McLaurin and McKinney met with then-Director of Employee Relations Steve Foster to discuss their impressions of Dowell's leadership and the OEI as a whole. (QM Tr. 121-24).  McLaurin's notes from this meeting demonstrate that they discussed, among other matters, the recent promotions, wanting phone stipends, and "working untenable conditions," which were outlined as "construction, no break room, . . .[] had to bring in my own mini fridge." (QM Tr. 183-85, Exs. 14 and 15).  McLaurin testified that, while it was not in his notes, he also raised concerns about Dowell's treatment of him as an individual.  (QM Tr. 123).  McLaurin then admitted that he never reported discrimination but rather "intermingled" topics about Dowell's conduct generally into a discussion about his leadership to "let [Foster] know that [he] believed Mr. Dowell's conduct to be inappropriate, to be wrong. . . ."  (QM Tr. 134-36).

Foster's general take-away from the meeting was that McLaurin and McKinney were frustrated with department changes and its direction in light of contrary promises from Dowell. (SF Tr. 19-23; SF Decl. ¶¶14-16).  Foster followed up with McLaurin and determined that a second meeting with Kennedy present would be beneficial.  (QM Tr. 185-88, Exs. 16-17; SF Decl. ¶19).

On February 4, 2020, McLaurin and McKinney met with Foster and Kennedy.  (SF Tr. 19-23).  By this point, their promotions had gone into effect.  (QM Tr. 127-28, 188, Ex. 18).  McLaurin and McKinney wanted to know how they could be moved into the new positions they had declined without their approval as to pay.  (QM Tr. 173).  Kennedy participated in this meeting.  (QM Tr. 129-30).  Foster explained that, while that was not Liberty's normal practice, it was not unlawful. (QM Tr. 128).  Kennedy reiterated that McLaurin could take the pay that was being offered with

the position, or not have a job.  (QM Tr. 190). Kennedy also agreed to hold bi-monthly divisional meetings to better understand the OEI's efforts.  (QM Tr. 192-93, Ex. 22).  McLaurin was still frustrated with the changes in the office and not having received the compensation increase he wanted, so he continued applying for other jobs.  (QM Tr. 194).

### f.   McLaurin Advocates for the LGBTQ+ Community

McLaurin claims that he often encouraged the OEI staff to do more for LGBTQ+ students. (QM Tr. 83-84; 199-201).  McLaurin claims that he experienced obstacles in pushing his LGBTQ+ agenda forward.  At some point in 2018, OEI scheduled a meeting that Dowell was supposed to attend where "students, staff, alumni, and allies were going to come together and talk about the concerns of the queer population on campus."  (QM Tr. 84, 96-97).  McLaurin claims Dowell inexcusably cancelled the meeting.  (QM Tr. 84, 97-98; GD Decl. ¶26(a)).

McLaurin claims that Dowell called him into a meeting and "spent no less than 20 minutes berating [him] on how [he] needed to believe a certain way when it came to sexual orientation, . . . letting [McLaurin] know that [he] needed to get in line with his beliefs when it came to sexual orientation and how [Liberty] approach[es] that with students and how [to] talk about it. . . ."  (QM Tr. 82, 92-96).  McLaurin speculates Dowell "zero['ed] in" on him because McLaurin was not aware of Dowell questioning other employees in this manner.  (QM Tr. 83, 92; GD Decl. ¶26(c)). McLaurin assumed from this conversation that the OEI would not support the LGBTQ+ community under Dowell's leadership.  (QM Tr. 94).

In another meeting, McLaurin claims that Dowell stated, "Gay people should just be happy that we allow them to come here."  (QM Tr. 92-93).  McLaurin further claims that when he tried to discuss how LGBTQ+-identifying students were bullied, Dowell responded that "he didn't believe that homophobia existed on [] campus," instead referring to such conduct as "buffoonery."

(QM Tr. 93).  Dowell denies ever making these comments and Mercer confirms that he never heard Dowell make these comments or oppose McLaurin's agenda to support to the LGBTQ+ community.  (GD Tr. 136-37; GD Decl. ¶26(b); JM Tr. Pending).

During a division-wide meeting with Kennedy in Spring of 2020, McLaurin claims he stated, "as part of [his] agenda for [his] area, that [OEI] needed to do more for [] queer students. . . ." (QM Tr. 84-85, 199-201).  Kennedy was receptive to McLaurin's proposed agenda, but shortly after the meeting, McLaurin claims that Mercer informed him that Dowell was extremely angry; however, Mercer denies ever saying this or ever having any conversation with Dowell about McLaurin's agenda.  (QM Tr. 85; JM Tr. Pending).  Later, Mercer and McLaurin went to Dowell's office to discuss an upcoming cultural competency training that McLaurin was doing for students. According to McLaurin, Dowell questioned him about whether he believed that God loved all people.  (QM Tr. 85-86, 99-100, 254-60).  Dowell denies any discussion of whether God loves all people, and confirms he sought to understand McLaurin's Biblical worldview because integrating Liberty's Biblical worldview was a requirement of all employees when working with students directly.  (GD Decl. ¶26(c)).  Dowell, who is a pastor, often had these conversations with all OEI employees, regardless of protected status.  (GD Decl. ¶26(c); GD Tr. 73-76; JM Tr. Pending).

McLaurin claims that he refused to answer, stating to Dowell, "It is not your right to know what my personal beliefs are," to which Dowell allegedly responded, "It is my right to know. I'm your boss. . . ." (QM Tr. 86, 99-100).  McLaurin claims he ultimately responded that he believed God loved all people, and that Dowell went on a "tirade about how God hates different people," which McLaurin took to mean gay people though Dowell never made any references to sexual orientation.  Dowell testified he has never believed and does not believe that God hates gay people. (QM Tr. 86-87, 104-05; GD Tr. 122-23; GD Decl. ¶26(d); JM Tr. Pending).  During leading

questioning by his counsel, McLaurin added that, in this meeting, Dowell compared McLaurin to "a wild stallion who need[ed] to be broken in," which McLaurin interpreted as a reference to Black male slaves. (QM Tr. 259-60).  Dowell denies making this statement. (GD Decl. ¶27).  Mercer, who was in the meeting, denies hearing this statement at this time or any time  (JM Tr. Pending).

According to Mercer, this debate was merely about the interpretation of scripture and had no reference to sexual orientation.  (JM Tr. Pending).  While such debates were common among employees, this dispute got heated.  (JM Tr. Pending).  McLaurin claims that Mercer told him that Dowell was upset "because of his personal issues with [McLaurin] and [McLaurin's] sexuality. . . ."  (QM Tr. 88-89).  Mercer denies ever making this statement.  (JM Tr. Pending).

Dowell denies ever knowing McLaurin's sexual orientation, and McLaurin admits he never told him.  (QM Tr. 102; GD Tr. 199-21, 137; GD Decl. ¶25.  However, McLaurin speculates that Dowell knew based on "connections" between "comments that [Dowell] made particularly toward [McLaurin]," and because Mercer supposedly told McLaurin this was the reason Dowell was questioning him about his religious beliefs.  (QM Tr. 101).  Mercer also denies ever making this statement, knowing McLaurin's sexual orientation and having conversations with Dowell about McLaurin's sexual orientation.  (JM Tr. Pending).

### g.  McLaurin Asks HR About Liberty's View on Sexual Orientation

Shortly before resigning, on May 19, 2020, McLaurin reached out to Foster to discuss "sexuality and protections that are available legally and institutionally for staff. . . ."  (QM Tr. 131-32, Ex. 27; SF Tr. 26-27; SF Decl. ¶21).  McLaurin opened up to Foster for the first time about his sexual orientation and explained to Foster that he wanted to publish some articles about his life experiences, which he admitted included "overlap with [his] experiences at Liberty."  (QM Tr. 133; SF Tr. 27-28).  Essentially, he wanted assurances from Foster that if he discussed his

experiences publically as a gay man at Liberty by "pursu[ing] this creative outlet," he was not going to experience any negative reaction.  (QM Tr. 133-34).

McLaurin admitted that Foster did not hold any animus toward the LGBTQ+ community. (QM Tr. 132; SF Tr. 28).  Rather, Foster explained that "while [Liberty] may not necessarily care [about an employee's sexual orientation], so to speak, he couldn't guarantee that there wouldn't be fallout if people basically wanted to make it into an issue."  (QM Tr. 132-34; SF Tr. 28; SF Decl. ¶21).  They apparently discussed a new law in Virginia that provided protections for employees based on their sexual orientation, and Foster was unaware of how that would be applied at Liberty in light of Liberty's Doctrinal Statement's position on same-sex relationships.  (QM Tr. 132; SF Tr. 28-31, 48-49, 51; SF Decl. ¶21).  Foster never informed Dowell (or anyone else for that matter) of McLaurin's sexual orientation or that he had this meeting.  (SF Decl. ¶22).

### h.  McLaurin Resigns Over Directive to Take Down BLM Post

On May 27, 2020, just two days after George Floyd was killed, Falwell tweeted that he would only wear a face mask with a picture of former Virginia Governor Ralph Northam in blackface on it.  (QM Tr. 177-78; GD Decl. ¶28).  McLaurin expressed to his colleagues that the OEI should do something in response to Falwell's racially insensitive post, but Mercer relayed to McLaurin that Dowell said "the best approach was to do and say nothing, because it would just blow over and it wasn't of very much consequence."  (QM Tr. 177-78).  Mercer's message frustrated McLaurin.  (QM Tr. 203-04).  McLaurin ultimately put up an away message stating, "It's too much. I'll see y'all later."  (QM Tr. Ex. 30).

On June 1, 2020, McLaurin drafted a social media post that, in sum, detailed racism as a sin and further emphasized that "[a]ll lives simply can NOT matter, until Black Lives Matter." (QM Tr. 204-05, Ex. 31).  McLaurin posted this to the OEI's official Instagram and Facebook

accounts.  (QM Tr. 204-05; GD Decl. ¶30).  Dowell saw the post, recognized that making a Black

Lives Matter statement on behalf of Liberty "could have []a global presence," and immediately

asked Mercer to take down the post on the basis that he had not authorized such a stance by the

OEI.  (GD Tr. 175-86; GD Decl. ¶30, Ex. E).  Mercer emailed McLaurin and other OEI staff

directing them to take down the post.  (QM Tr. 205-07, Ex. 31).  In response, McLaurin emailed

Kennedy, stating that he wanted to "lodge a formal complaint against Vice President Dowell"

regarding the directive to take down the post.  (QM Tr. 205-07, Ex. 31).  Kennedy responded to

McLaurin the morning of June 2, 2020, advising him as follows:

> VP Dowell has a right and obligation to be involved with social media posts that
> are coming out of any of the offices he oversees. As a VP he should be involved
> and have a say in the posts that make a university[-]owned social media account.
> What appears to be the issue is you seem to have a different opinions [sic] on what
> content should make the OEI social media pages. I am not saying what content
> should make the OEI social media pages….that is up to VP Dowell and Justin
> [Mercer] to decide. I would recommend you work through them on social media
> content.

(QM Tr. 207-08, 216, Ex. 38).

In response, McLaurin resigned on the basis that it was "morally unconscionable" for him

to remain as the Director of Diversity Retention and ask students of color to stay at Liberty when

he believed their well-being and lives were not valued.  (QM Tr. 209-11, Ex. 37).  Among other

accusations, McLaurin blamed Dowell for refusing "to allow our team of professionals to affirm

the sanctity of Black lives, . . . [and] hold our university accountable for recent events and actions."

(QM Tr. Ex. 37).  McLaurin was never disciplined for the social media post or any other conduct

while at Liberty.  (QM Tr. 115-20; SF Tr. 55; GD Decl. ¶35).  The OEI later issued a public Black

Lives Matter statement.  (GD Decl. ¶32, Ex. F).

### i.   McLaurin Engages in a Post-Resignation Quest Against Liberty

After his resignation, McLaurin engaged in a social media campaign to encourage employees and students of color to leave the University.  (GD Decl. ¶33).  McLaurin created a website called LUnderground Railroad, which sought fundraising to encourage employees to leave Liberty.  (QM Tr. 240-43, Ex. 48; GD Decl. ¶33).   In one Facebook post, McLaurin publically listed every employee of color within the OEI that had left the University.  (QM Tr. 235-38, Ex. 46).  He warned the public, "Do not send your Black children there."  (QM Tr. Ex. 46).  In another post he publicly asserted that Liberty engages in "spiritual abuse."  (QM Tr. 239-40, Ex. 47).

## II.   <u>STANDARD OF REVIEW</u>

A court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby. Inc*., 477 U.S. 242, 248 (1986).  Where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003), *cert. denied*, 541 U.S. 1042 (2004).  While a court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence [] the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

## III.     ARGUMENT AND AUTHORITIES

### a.  McLaurin's Work Environment was Neither Permeated with Discrimination Nor Was it so Intolerable that He had no Choice but to Resign

McLaurin alleges he was forced to resign after experiencing a hostile work environment on the basis of his race, sexual orientation, and religion.[5]  This combined hostile environment and constructive discharge claim is also known as a "hostile-environment constructive discharge" claim.  *Evans v. Int'l Paper Co.*, 936 F.3d 183, 191 (4th Cir. 2019).  McLaurin admitted he was not aware of any direct evidence of discrimination to support his claims; instead, he relies on circumstantial evidence.  (QM Tr. 243-44).  To succeed, McLaurin must demonstrate (i) he experienced unwelcome harassment; (ii) the harassment was based on his race, sexual orientation, and religion; (iii) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (iv) there is some basis for imposing liability on Liberty.  *Evans*, 936 F.3d at 192.

Because McLaurin voluntarily resigned, he must show "something more"—he must show that Liberty deliberately harassed him "to the point where a reasonable person in [his] position would have felt compelled to resign."  *Evans*, 936 F.3d at 193 (citing *Green v. Brennan*, 136 S.Ct. 1769, 1777 (2016)).  The harassment experienced must effectively amount to an adverse employment action.  *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1254 (4th Cir. 1985).  McLaurin, therefore, must also prove two additional elements to maintain the constructive discharge aspect of his claim: (v) the deliberateness of Liberty's alleged actions, motivated by bias about his race,

---

[5] McLaurin asserts claims under Title VII (race, sexual orientation, religion, and intersectional discrimination on the basis of all three protected classes), 42 U.S.C. § 1981 (race), and the Virginia Human Rights Act, Va. Code § 2.2-3905 *et seq.* ("VHRA") (race, sexual orientation, and religion).  For the same reasons McLaurin's claims fail under Title VII, they fail under § 1981 and the VHRA—both of which provide for similar statutory protections and remedial analysis.  *See Benson v. Vaughn Indus. LLC*, 450 F. Supp. 3d 655, 664 (E.D.N.C. 2020) (noting same framework for Title VII and § 1981).

sexual orientation, and religion; and (vi) the objective intolerability of his working conditions. *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 425 (4th Cir. 2014). McLaurin fails on all fronts.

It is undisputed that Dowell's request that the OEI remove McLaurin's Black Lives Matter post was the colloquial straw that broke the camel's back for McLaurin. Indeed, McLaurin's own resignation letter makes it perfectly clear that he had substantial philosophical differences with Liberty's management on numerous issues. It is also undisputed that McLaurin experienced over a year and a half of frustration with different aspects of the OEI. In fact, he admitted to seeking employment elsewhere multiple times throughout his tenure. (QM Tr. 158-62). Nevertheless, it was not until Liberty demonstrated an unwillingness to allow McLaurin to use Liberty's official social media channels to publically denounce Falwell's blackface tweet or counter it with his desired statement, that McLaurin resigned.

While evidently frustrated, McLaurin was not the victim of unlawful harassment. In *Bristow*, the Fourth Circuit explained that an employee cannot maintain a constructive discharge claim where he "resigned due to [nothing] other than universal workday frustrations," especially when it is obvious the employee's "resignation arose from a particular [] dispute with his supervisors." *Bristow*, 770 F.2d at 1256. Despite the obvious causes of McLaurin's resignation, he now claims that he was pushed out the door—that he was subject to conditions that were not only intolerable for a reasonable person, but also not experienced by his coworkers because they were not Black, gay Christians like him.

       i.  **<ins>Race Discrimination:</ins>** <ins>McLaurin's race discrimination claims are premised on his frustration with the OEI's initiatives, not actionable harassment.</ins>

To support his claim of discrimination on the basis of race, McLaurin points to his experience attending the Candace Owens event, Dowell's alleged reference to him as a wild stallion, and his leadership's unwillingness to support his Black Lives Matter post.

There is simply no evidence that these experiences occurred because of his race.  McLaurin himself did not dispute that he planned and attended the Candace Owens event as a requirement pursuant to his job duties as the Associate Director of Student Engagement.  (QM Tr. 144, 148-50).  McLaurin also admitted that Dowell merely compared him to a wild stallion with no reference to race.  Rather, it was McLaurin's purely subjective impression the comment was racial based on his own interpretation of the phrase's historical significance.  Even if Dowell's wild stallion comment ostensibly had a connection to race, one off-hand comment is insufficient to constitute severe and pervasive harassment.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'").

 As noted above, Dowell is also Black, which weakens any inference the alleged "wild stallion" comment was racially motivated.  *Brown v. OMO Grp., Inc.*, 2017 WL 1148743, at *4 (D.S.C. Mar. 28, 2017) ("Courts, including this one, have found that the fact that the decisionmaker is a member of a plaintiff's protected class weakens a possible inference of discrimination.").  Ironically, though, when McLaurin's counsel asked him how Dowell, as a Black man, could discriminate against or harass McLaurin as a Black man, McLaurin referred to Dowell as a "coon," and an "Uncle Tom,"—both racially insensitive terms used to describe "someone who is actively working against the progress of their own people."  (QM Tr. 260-61).

McLaurin's philosophical differences with Dowell were evident when it came to McLaurin's Black Lives Matter post.  This is not a case where an employee was disciplined for showing solidarity with the Black Lives Matter movement on his own private social media; rather, this is a case where an employee used his position to advocate for his own agenda by publically posting on behalf of the University and the post was removed.  While Dowell did not disagree with

McLaurin's statement that Black lives mattered, he did not feel it was appropriate for the OEI to make a public statement of the sort without approval from Liberty's executive leadership. Significantly, McLaurin was never even disciplined for the post or his refusal to take it down.  It is undisputed that Liberty's decision to take down the post frustrated McLaurin to a point he resigned, but in no way would a reasonable person in McLaurin's position have felt they had no choice but to resign.[6]  *See Bristow*, 770 F.2d at 1255 ("[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge.").

      ii. **Sex Discrimination:** <u>McLaurin failed to produce any nexus between his sexual orientation and the harassment he allegedly experienced; nonetheless, Title VII does not protect his desire to advocate for the LGBTQ+ community at Liberty.</u>

      1. *Dowell was not aware of McLaurin's sexual orientation and the complained of conduct does not amount to objective intolerability.*

To support his claim on the basis of sexual orientation, McLaurin points to Dowell's cancellation of a meeting in 2018 that would have demonstrated support for the LGBTQ+ community on campus, Dowell's request to know McLaurin's beliefs in Spring of 2020, and Dowell's alleged off-hand comments that "Gay people should just be happy that we allow them to come here," and that "he didn't believe that homophobia existed on [] campus."[7]

As an initial matter, McLaurin cannot demonstrate that Dowell harassed him based on his sexual orientation because it is undisputed Dowell was not aware McLaurin was gay until after McLaurin's resignation.  (QM Tr. 102; GD Tr. 199-21, 137; GD Decl. ¶25).  It is presumed that

---

[6] Whether Liberty's decision to take down the post was a bad idea is irrelevant so long as its decision to take down the post was not because of McLaurin's race.  *See DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998) (noting the court cannot sit as a super-personnel department determining whether the employer's decisions were wise, fair, or even correct, so long as they were non-discriminatory).

[7] Dowell denies the substance of these alleged comments, however, as disputed facts, they must be taken as true for purposes of this Motion.  As explained below, even if true, such comments do not amount to an actionable hostile work environment, much less do they create the grounds for a constructive discharge.

an employee did not experience discrimination on the basis of his sexual orientation when the alleged harasser was unaware of the employee's sexual orientation.  *See, e.g.*, *Dean v. Metro Staffing*, 2021 WL 1208972, at *6 (N.D. Ill. 2021) (presumption decision was not discriminatory when decisionmaker not aware of employee's sexual orientation at time of decision).

McLaurin also failed to demonstrate that these four instances, spanning over a period of two years, made his working conditions so objectively intolerable he had no choice but to resign. There certainly may have been tension and normal workplace frustrations between Dowell and McLaurin when it came to OEI initiatives, staffing and programming, but "[t]he fact that problems and tensions are encountered on the job does not suffice to establish constructive discharge." *Bristow*, 770 F.2d at 1254.  McLaurin's mere speculation that Dowell singled him out for any protected reason is insufficient to meet the high bar of deliberateness, which is required to show the employer's actions were "intended" to force the employee to quit.  *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (noting speculation is insufficient for summary judgment); *Bristow*, 770 F.2d at 1255 ("Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit.") (internal quotations omitted).

2.  *The fact that Liberty as an institution believes same-sex marriage is a sin is of no moment.*

To the extent McLaurin is trying to convict Liberty for discrimination by having religious beliefs that characterize same-sex marriage or same-sex attraction as a sin, McLaurin's claims fail. Such a premise does not support his sexual orientation or religious discrimination claims. Liberty's institutional religious beliefs are no secret.  What Liberty believes as an institution is irrelevant to whether McLaurin experienced unlawful harassment at Liberty.  A mere belief does not infringe on another's rights and does not constitute actionable harassment.  *See Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1167–68 (4th Cir. 1985) ("Each person's

right to believe as he wishes and to practice that belief according to the dictates of his conscience so long as he does not violate the personal rights of others, is fundamental to our system.").  This is especially true in light of Dowell's specific explanation that, according to Liberty's religious doctrine, "[w]e're all sinners."  (GD Tr. 122).

> 3.  *Any religious preferences in conflict with advocacy for the LGBTQ+ community should be resolved in Liberty's favor.*

As a religious institution with an express religious mission, Liberty has a right not to associate with persons advocating for conduct contrary to the moral tenets of its faith.  Employees are expected to uphold the teachings and principles of Liberty's codified religious beliefs by serving as role models to students and carrying out their duties through a lens of faith consistent with Liberty's beliefs.  McLaurin does not complain that Liberty treated him any differently on the basis of his sexual orientation, but rather claims that he faced obstacles in carrying out his duties when advocating for the LGBTQ+ community, such as Dowell canceling a meeting to support the LGBTQ+ community or berating McLaurin about his beliefs after a divisional meeting where McLaurin announced his agenda to provide more support for LGBTQ+-identifying students.  As a matter of law, Title VII does not protect McLaurin for advocacy in conflict with his religious employer's stated agenda.  *See Billard v. Charlotte Cath. High Sch.*, 2021 WL 4037431, at *7 (W.D.N.C. Sept. 3, 2021) (noting there is a distinction between terminating an employee because of his sexual orientation versus terminating an employee for advocating for a particular stance in conflict with a religious institution's objectives).

In *Bostock v. Clayton Cty., Georgia*, the Supreme Court of the United States held that Title VII protects employees from discrimination on the basis of sexual orientation.  140 S. Ct. 1731, 1737 (2020).  However, the Court in *Bostock* declined to determine how doctrines protecting religious liberty interact with Title VII, stating those "are questions for future cases."  *Id.* at 1754

(noting that "employers in other cases may raise free exercise arguments that merit careful consideration" but that was not before the Court).  One of those unanswered questions is how to protect a religious institution's ability to teach principles consistent with its faith when such principles seemingly conflict with Title VII.

In *Billard*, Charlotte Catholic High School terminated a male substitute teacher after he announced on Facebook his engagement to another man.  *Billard*, 2021 WL 4037431, at *7.  The School tried to characterize its termination of the teacher as terminating him for advocating for same-sex marriage, which was contrary to its tenets.  *Id.*  The court recognized that "the religious and philosophical objections to gay marriage are protected views and, in some instances, protected forms of expression," but that gay people have protections too.  *Id.* at *1.  While the court noted there may be a distinction if the termination were really for his advocacy, the School could not cloak its unlawful termination as advocacy when it was clear the teacher's announcement of his engagement was only considered advocacy because of his sex.  *Id.* at 7 (noting the School admitted it would not have instituted the same discipline if a woman announced her engagement to a man).

The facts of McLaurin's case are vastly distinct from *Billard*.  It is undisputed that McLaurin "talked to everyone . . . about the importance of advocating for [Liberty's] queer members on campus."  (QM Tr. 95-96).  In response, McLaurin admits Liberty never took any adverse action against him but merely pushed back on his agenda, though he characterizes this pushback as "harassment."  Even if Liberty pushed back, it would have been within its rights as a religious institution to prevent such advocacy in conflict with its institutional religious beliefs.

Another unanswered question in *Bostock* is whether a religious employer might have a viable statutory or constitutional defense to Title VII claims of sexual orientation discrimination in light of a religious employer's "strong legal protections for hiring and firing employees who

have a role in promoting their religion's message." *Id.* Sections 702(a) and Section 703(e) of Title VII offer narrow exemptions (and shields of liability) to religious institutions from suits for religious discrimination when the institutions can show (i) the purpose of the employment decision is religious discrimination; and (ii) that sex is not a but-for cause in the decision. *Id.* at 10.

To the extent McLaurin's allegations were supported, such a defense would undoubtedly apply here. McLaurin's sexual orientation was not a factor in any of the alleged pushback, as it is undisputed that Liberty does not tolerate harassment on the basis of sexual orientation and Liberty was not aware McLaurin was gay until after his resignation. It is also undisputed that any alleged pushback was framed in the context of Dowell pressing McLaurin as to what he believed about God and his desire to know McLaurin's Biblical worldview before McLaurin carried out a cultural competency training for students. As such, while Liberty needs no further defense in this matter given McLaurin's clear failure of proof, the facts of this case fall squarely within Title VII's exemptions,[8] balancing both Title VII's protections for employees from discrimination on the basis of sexual orientation with Liberty's rights as a religious institution to promote the tenets of its faith.

      iii.  <u>**Religious Discrimination:**</u> <u>McLaurin's attempt to conflate his religious</u> <u>discrimination claim with his sexual orientation claim lacks merit.</u>

To show that his harassment was based on his religion, McLaurin must show that it was the religious aspect of his conduct that motivated Liberty's desire to push him out. *See Pedreira v. Kentucky Baptist Homes for Child., Inc.*, 579 F.3d 722, 728 (6th Cir. 2009). However, McLaurin failed to present any evidence he experienced discrimination on the basis of his religion. At most,

---

[8] The VHRA provides similar exemptions from employment discrimination for religious institutions. Va. Code §§ 2.2-3905(C)(2) and (E). For the same reasons his claims are barred under Title VII, they are barred under the VHRA.

he has made clear, and it is undisputed, that his personal beliefs about scripture did not align with Liberty's institutional beliefs or those of Dowell.  (QM Tr. 218-19, 247-49).

Such philosophical differences, though, especially at a religious institution, are insufficient to support a claim of discrimination on the basis of religion.  In *Pedreira*, the plaintiff, who was openly gay, worked for Kentucky Baptist Homes for Children.  *Pedreira*, 579 F.3d at 725.  She claimed she was terminated on the basis of her religion because she did not hold her religious employer's belief that homosexuality was sinful.  *Id.* at 727-28.  The court dismissed her claim, finding that there was no allegation that her employer equated her sexuality with her religious beliefs or lack thereof.  *Id.* at 728.  Similarly, no evidence exists that Liberty took any action against McLaurin because he did not believe homosexuality was sinful.

Outside of his failed attempt to conflate his sexual orientation as a religious belief in conflict with Liberty's religious beliefs, McLaurin presented no evidence he experienced discrimination based on his religion.  Rather, at most, Liberty sought to know his religious beliefs, which it had every right to as a religious institution.  Even if the inquiry into his beliefs turned into a heated debate about scripture, such an inquiry as to one's beliefs or the resulting debate does not constitute religious discrimination, much less a deliberate effort to force McLaurin to resign.[9]

    iv.  **<u>Intersectional Discrimination:</u>** <u>McLaurin failed to prove the conduct he experienced was consistent with some distinct stereotype.</u>

McLaurin also asserts a claim against Liberty on the basis of '"intersectional discrimination" because he is a Black, gay Christian.  Compl. ¶24.  Intersectional discrimination is a rarely-advanced theory that the Fourth Circuit has yet to address.  It is a "theory [that] applies

---

[9] As noted above, to the extent Liberty is deemed to have acted on the basis of McLaurin's religion, such conduct is also within the scope of Title VII's explicit exemption for religious institutions.  *See* 42 U.S.C. §§ 2000e-1(a) and 2000e-2(e)(2).

to plaintiffs who have been discriminated against because of distinct stereotypes associated with persons belonging to two or more protected classes." *Brown v. OMO Grp., Inc.*, 2017 WL 1148743, at *5 (D.S.C. Mar. 28, 2017).  For example, Title VII prohibits discrimination against African American women even if the employer does not discriminate against white women or African American men.  EEOC Compliance Manual, Section 15: Race and Color Discrimination, EEOC.gov (Last visited Feb. 22, 2017), https://www.eeoc.gov/policy/docs/race-color.html.

Even if this Court were to adopt an intersectional discrimination theory, McLaurin has not produced any evidence that the harassment he allegedly experienced was based on the fact that he was not just Black and gay, or gay and Christian, or even Black and Christian, but rather it was because he was a Black, gay Christian.  McLaurin failed to produce any evidence demonstrating that some distinct stereotype exists about people who identify as Black, gay Christians, and that he experienced conduct consistent with that stereotype.  McLaurin also failed to prove that other Black employees who were outside his combined-protected classes had different experiences, such as those employees who were gay and Christian but not Black or Black and Christian but not gay.

For the reasons discussed above, the conduct McLaurin allegedly experienced, whether assessed on the basis of each protected class individually or in combination of all three, fails to amount to calculated conduct that is deliberately intended to force McLaurin to resign.

     v. <u>McLaurin never reported harassment; thus, no liability should be imputed.</u>

McLaurin never reported to Human Resources or anyone that he experienced harassment and therefore Liberty has an affirmative defense to his claims.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293, 141 L. Ed. 2d 662 (1998).  McLaurin was aware of Liberty's harassment reporting procedures and he never reported any harassment.  (QM Tr. 219-20; SF Decl. ¶10).  McLaurin had a duty to avail himself of Liberty's formal remedial measures

before resigning.  *Evans*, 936 F.3d at 193 ("Unless conditions are beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress.") (citations omitted).  This, McLaurin did not do and, therefore, his claims are barred.

In sum, McLaurin cannot meet the standard for a hostile work environment claim, much less the heightened standard for a combined hostile-environment constructive discharge claim. Accordingly, summary judgment should be granted in Liberty's favor as to Claims 1-4 and 6-7.

      **b.  To the Extent McLaurin Alleged a Disparate Treatment Claim on the Basis of Pay, This Claim Also Fails.**

McLaurin claimed that when offered the position of Director of Diversity Retention, the compensation Dowell offered him was significantly lower than the earnings of his predecessor, Hernandez, who was a cisgender Hispanic male.  (Compl. ¶18; QM Tr. 225-26).  To prove discrimination in pay on the basis of race or sexual orientation, he must demonstrate that he was paid less than similarly situated employees outside his protected classes.  *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019), *as amended* (Mar. 26, 2019).  McLaurin and Hernandez were not similarly situated.  It is undisputed that "the compensation [Hernandez] was receiving [was] commensurate with the responsibilities and the experience that he had," which included additional duties beyond those McLaurin performed, and with Hernandez's two master's degrees. (GD Tr. 144-47; GD Decl. ¶24).

Even if McLaurin could establish he and Hernandez performed comparable work, Liberty proffered a legitimate, nondiscriminatory explanation for the wage disparity.  *Spencer*, 919 F.3d at 208.  Dowell testified that, at the time he offered the promotion to McLaurin, he also offered promotions to four other employees and thus was working with a limited budget and could only increase each employee's pay so much without impacting the pay of the next-level supervisors or the budget as a whole.  (GD Tr. 165-67).  Despite these constraints, Dowell still advocated for

increased pay for all five employees.  (GD Tr. 168-72; GD Decl. ¶22).  Budgetary constraints qualify as a non-discriminatory factor other than race or sex.

### c.   McLaurin's Retaliation Claim Also Lacks Merit.

McLaurin claims that he reported discrimination and harassment and, in return, experienced further harassment.  (Compl. ¶¶37-38).  To prove retaliation, McLaurin must prove that (i) he engaged in protected activity; (ii) he suffered an adverse employment action at the hands of Liberty; and (iii) Liberty took the adverse action *because of* the protected activity.  *See Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 543 (4th Cir. 2003).

McLaurin never engaged in protected activity.  *See supra* section a(vi).  He likewise never experienced any adverse action.  It is undisputed McLaurin was never formally disciplined, though he claimed he experienced what he referred to as a "broad" form of discipline, stating, "[Dowell] would just become really combative, really argumentative, there were times where, because I may not align with his vision, a project may be halted or put on leave."  (QM Tr. 115-20; GD Decl. ¶_).  The fact that he and Dowell continued to have differences of opinion about the OEI's direction does not amount to an adverse action.  Even so, there is no evidence Dowell knew McLaurin spoke with HR, and therefore no evidence he took any action *because* McLaurin allegedly engaged in protected activity.  (QM Tr. 138; JM Pending).  Thus, summary judgment should be granted in Liberty's favor as to Claim 5.

### d.   McLaurin's Claims Are Barred by the Ministerial Exception

McLaurin's claims are also barred by the ministerial exception.  *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055, 207 L. Ed. 2d 870 (2020) (explaining the ministerial exception doctrine affords religious institutions a degree of autonomy when it comes to employment decisions about ministers); *Gordon College v. DeWeese-Boyd*, 595 U.S.

__(Feb. 28, 2022) (*Alito J. statement on den. of cert.*) (rejecting a narrow view of religious education when assessing ministerial exception, implying educating through a "faith-based" lens may be enough); *see also Palmer v. Liberty Univ., Inc.*, WL 6201273, at *5 (W.D. Va. Dec. 1, 2021) (noting Liberty is a religious institution).  In his various OEI positions, McLaurin worked toward carrying out Liberty's Christian mission to Train Champions for Christ, admitting, "that pretty much all the work that is done during the time that [he] was there and the focus [OEI] tried to put on it was with a lens of faith."  (QM Tr. 229).  This approach was confirmed by other employees.  (JM Pending; GD Decl. ¶26(c)).  As such, he performed a vital role in educating and forming students in the Christian faith. Accordingly, all of McLaurin's claims are subject to dismissal on the alternative ground that they are barred by the ministerial exception.

## IV.   **CONCLUSION**

For the aforementioned reasons, Liberty respectfully requests this Court enter an Order granting summary judgment in its favor and dismissing McLaurin's Complaint, with prejudice, and for such other and further relief as the Court deems appropriate.

Dated: March 2, 2022

Respectfully submitted,

LIBERTY UNIVERSITY, INC.

By: */s Leah M. Stiegler*

King F. Tower, Esq. (VSB No. 38767)
ktower@woodsrogers.com
Leah M. Stiegler, Esq. (VSB No. 89602)
lstiegler@woodsrogers.com
WOODS ROGERS PLC
10 South Jefferson Street, Suite 1400
Roanoke, Virginia 24011
Phone: (540) 983-7600
Fax: (540) 983-7711
*Counsel for Liberty University, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of March 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


_____*/s Leah M. Stiegler*_____