CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
4/18/2022
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
      DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| LEEQUAN MCLAURIN, <br> *Plaintiff,* <br><br> v. <br><br> LIBERTY UNIVERSITY, <br> *Defendant.* | CASE NO. 6:21-cv-00038 <br><br> MEMORANDUM OPINION <br><br> JUDGE NORMAN K. MOON |

In June of 2020 LeeQuan McLaurin resigned his position as Liberty University's Associate Director of Student Engagement and Director of Diversity Retention. Dkt. 1 ¶ 13. While he was not fired, McLaurin insists that he did not leave voluntarily. He instead alleges that his supervisors subjected him to sexual, racial, and religious harassment so severe and abusive that he was compelled to seek employment elsewhere. He filed the instant lawsuit to recover compensatory and punitive damages, costs, and to obtain a structural injunction against Liberty. Dkt. 1 ¶ 47.

McLaurin's first five claims are brought under Title VII of the Civil Rights Act of 1964. In counts one through four, McLaurin alleges that because of his membership in various protected classes —those being his race (Count Four), sexual orientation (Count Three), religion (Count Two), and the intersection between his religion and sexual orientation (Count One)—he was subjected to harassment constituting a hostile work environment. *Id*. at ¶ 23–35. Count Five alleges that Liberty unlawfully retaliated against McLaurin when he attempted to address the problem by lodging a complaint with Liberty's Human Resources department. *Id*. at ¶¶ 21, 36–40.

Liberty has filed a motion for summary judgment on all counts. Dkt. 23. Among other things, Liberty argues that even if McLaurin's supervisors created a hostile work environment it cannot be held liable for their actions because it is entitled to rely on its anti-harassment measures. Dkt. 24 pp. 22–23; Dkt. 31:2–8. The *Faragher/Ellerth* line of cases provides an affirmative defense in suits like this one to employers who had policies and procedures in place to prevent and address Title VII violations and where the Title VII plaintiff employee failed to take advantage of them. In this scenario, there is no basis for imputing the wrongdoing of an employee's supervisors onto the employer. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). Without commenting on whether McLaurin has otherwise alleged circumstances constituting a hostile work environment, the Court finds that the affirmative defense applies.

# I

The facts relevant to the *Faragher/Ellerth* defense are not seriously in dispute. First, the parties agree that McLaurin's Title VII claims arise from the alleged actions of his supervisors. Most notably the hostility of Greg Dowell, Liberty's Vice President of Diversity, Equity, and

Inclusion, Dkt. 29, p. 3, toward homosexuality[1] and the racially charged appropriation of McLaurin's name, likeness, and reputation to promote Liberty's political agenda.[2]

Second, it is equally clear that Liberty had anti-harassment policies and procedures in place. By declaration of Steve Foster, Liberty's Executive Director of Human Resources, Liberty offered unrebutted evidence that "Liberty maintains equal employment opportunity and discrimination policies" in an employee handbook which is reviewed and signed by every onboarding employee. Dkt. 25, Ex. 1 ("Foster Decl.") ¶ 10. The policies provide that "[a]ny employee who wants to report an incident of harassment is advised to promptly report the matter to HR" and that "[e]mployees can raise concerns and make reports without fear of reprisal." *Id*. Foster further testified that "[e]mployees can always access the policies through the Employment Handbook, the intranet, or by asking any supervisor, manager or Human Resources personnel for assistance." *Id*. *See also id*., Ex. B p. 2 (Sexual and Other Unlawful Harassment Complaint

---

[1] McLaurin alleges that Dowell was openly antagonistic toward him because of his sexual orientation. Including by debating scripture, Dkt. 29, Ex. C ("Mercer Dep.") 71:8–72:18, and expressing his view that "as a Christian, you were supposed to believe people who identified as gay are an abomination to God," Dkt. 25, Ex. 3 ("McLaurin Dep.") 247:4–15, and that "Gay people should just be happy that we allow them to come here," McLaurin Dep. 92:14–25. McLaurin also testified that he felt uncomfortable around Dowell, McLaurin Dep. 89:17–23, and that Dowell yelled at him "for whatever made him angry" and "for just who I was as a person and an individual," McLaurin Dep. 115:7–22. *See also* Dkt. 29 pp. 20–21.

[2] McLaurin alleges that Liberty used him "as a 'Black face' to both promote Liberty University to minority students, and force minority students to attend political events that [Liberty] wished them to attend for its own political purposes." Dkt. 29, p. 1. Specifically, McLaurin alleges that he was "forced to organize, attend, and recruit students to attend" a Candace Owens event. *Id*. at 11. McLaurin describes Candace Owens as "a controversial, outspoken Black conservative political figure" and her event as "targeted to recruiting Black Americans to leave the Democratic Party and join the Republican Party." *Id*. Despite complaints from himself and minority students that their participation "felt like 'forced representation,'" McLaurin alleges he was required to ensure that both he and minority students attended. *Id*. McLaurin further alleges that, even after knowing his opposition to the Candace Owens event, Liberty caused a university-wide email promoting the event and containing his picture to be sent from his university email address. *Id*. at 12.

Procedure); Ex. C p. 3 (Procedures for Reporting Discrimination, Harassment, and Sexual Misconduct). McLaurin himself confirmed that he knew where to access the employee handbook. *See* McLaurin Dep. 219:21–220:18.

The relevant section of the handbook provides:

> Any person may report Prohibited Conduct (whether or not the person reporting is the alleged victim). Reports of Prohibited Conduct, including Discrimination and Harassment, can be submitted or received through the following University channels: Liberty University SpeakUP! Form; a Beacon Incident Report; Walk-In/Appointment with the Executive Director/Title IX Coordinator, an Investigator, or a Deputy Coordinator; an email from a Responsible Employee to the [Office of Equity and Compliance, "OEC"], the Executive Director/Title IX Coordinator, an Investigator, or a Deputy Coordinator on the Complainant's behalf; an email, letter, or telephone call to the OEC, the Executive Director/Title IX Coordinator, an Investigator, or a Deputy Coordinator. Reports and Formal Complaints of Prohibited Conduct may be made at any time (including non-business hours). Reports of Prohibited Conduct can also be made to LUPD or to local law enforcement at the contact information above, but such reports will be handled pursuant to law enforcement procedures and not necessarily pursuant to this Policy.

Dkt. 25, Ex. 1 p. 26.

Third, there is no genuine issue of material fact respecting McLaurin's failure to follow these policies and procedures to report a Title VII violation. Indeed, even when viewed in the light most favorable to McLaurin, the record does not support a finding that McLaurin informed *any* relevant authority—identified by Liberty's policies or not—that he was experiencing harassment in the workplace. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (explaining that on summary judgment facts are recounted from the record in the light most favorable to the nonmoving party).

One might reach a different conclusion taking McLaurin's complaint and brief at face value. McLaurin's complaint alleges that he "went to HR multiple times about these issues,

– 4 –

including in May 2019 and January 2020." Dkt. 1 ¶ 21. And in arguing in opposition to this motion McLaurin insisted that he "complained repeatedly" to Justin Mercer, his direct supervisor; Ron Kennedy; and the Department of Human Resources. Dkt 29 p. 21. *See also id.* at 9–10, 16. But these contentions bear little relation to the accompanying record citations. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial.") (cleaned up).

McLaurin's best evidence is his own deposition testimony concerning a series of meetings with Human Resources in early 2020. McLaurin and his colleague, Jasmine McKinney, reached out to Foster in January of that year with the desire to "discuss some very concerning matters." Dkt. 25, Ex. 1 p. 31. Testifying in January of 2022 about their first conference with Foster, McLaurin stated that he and McKinney sought to address Greg Dowell's "general conduct towards his staff; his conduct toward me as an individual; pay discrepancies; [and] requests for us to do work outside of our job descriptions without proper title or compensation." McLaurin Dep. 123:13–17. About a subsequent, follow-up meeting with Foster, McLaurin testified that "compensation" and "job titles" were on the agenda. *Id.* at 127:17–128:13.

When pressed to specifically identify a time that he reported "discriminatory behavior," McLaurin stated that while he did not file "an official grievance" he had "made it clear" at these meetings "about the behavior from Greg Dowell which I believed to be discriminatory." *Id.* at 134:22–135:10. Asked to confirm that he reported sex discrimination, formally or informally, McLaurin became somewhat more equivocal, stating: "I did let [Foster] know that I believed Mr. Dowell's conduct to be inappropriate, to be wrong, and I was reporting to HR, the appropriate

– 5 –

office." *Id*. at 135:11–21. And when asked whether he ever made a complaint of racial or religious discrimination, he responded:

> I think during that conversation with Steve Foster where we attempted to go over all of those issues that we were having with Greg Dowell, that those topics are intermingled, but it's hard to really break down all of that in the amount of time that we had to go over everything. And again, I was in that meeting with myself and Jasmine, so it would have been difficult to just go down every single line item issue.

*Id*. at 135:1–4.

While his best evidence, this testimony is an exceedingly weak basis for a jury to find that McLaurin reported unlawful discrimination. McLaurin omits the details of what he said to Foster, making it difficult for a rational factfinder to draw the inference that Foster should have understood McLaurin to be reporting unlawful harassment. Still, even this vague testimony might create a jury issue were it not for the fact that it is inconsistent with the testimony of Foster, the notes Foster took contemporaneously with the initial meeting, and with McLaurin's own meeting notes.

When asked about his meetings with McLaurin and McKinney in early 2020, Foster recalled that McLaurin and McKinney had several structural changes that they wanted to see implemented in their department. Dkt. 25, Ex. 4 ("Foster Dep.") 20:7–23:23. According to Foster, "they had this proposal for a restructuring of the department" that Dowell had failed to adopt despite a prior commitment to do so—and that failure was the source of their complaint. *Id*. at 21:1–23:23. Not unlawful harassment. Foster's version of events is corroborated by an email Foster sent the day of the initial meeting in which he summarized his discussion with McLaurin and McKinney. *See* Dkt. 25, Ex. 1 at 36. The email is thorough. But no mention is made of Title VII discrimination or a hostile work environment.

– 6 –

McLaurin's January 2020 notes are likewise more consistent with Foster's recollection than they are with McLaurin's January 2022 deposition testimony. The notes reflect discussion of a host of workplace grievances, none of which implicate unlawful discrimination. The notes indicate discussion of pay disparity, the lack of a break room, disruptive construction work, the necessity of having to provide their own mini-fridge, the lack of break time, the lack of benefits information, the lack of a phone stipend, and various leadership issues unrelated to discrimination such as "lack of clear mission, direction, vision," "general lack of communication," and "no clear goals or objectives." *See* Dkt 30, Ex. 14. McLaurin further noted discussion of employee evaluations and annual raises and the general chipping away of "our area." *Id*. Two more bullet points indicate discussion of "space, personnel, programing" and "political affiliation." *Id*. Nowhere do McLaurin's notes make any mention of unlawful discrimination.

Turning to McLaurin's argument that he complained "to Mr. Kennedy, the Executive Vice-President of Enrollment Management," Dkt. 29 p. 9, the cited portion of McLaurin's deposition discusses meetings following-up on the meetings with Foster discussed above. McLaurin Dep. 127:17–131:18. That is, concerns relating to "compensation, our job titles." *Id*. at 127:20. Again, McLaurin does not claim, even while testifying in January 2022, to have brought a report of unlawful discrimination to Kennedy.[3]

---

[3] McLaurin's brief also cites a much later email exchange between McLaurin and Kennedy, *see* Dkt. 29 p. 16 n.129, in which McLaurin states that he would like to "lodge a formal complaint" regarding Dowell's insistence that McLaurin remove a Black Lives Matter post from Liberty's Diversity, Equity, and Inclusion Facebook page. Dkt. 25, Ex. 2 p. 30. McLaurin had made this post in response to complaints from students about Jerry Falwell posting a tweet of himself wearing a mask with a picture of Virginia's Governor in blackface. Dkt. 29 p. 16. Kennedy responds: "You mentioned you wanted to lodge a formal complaint against VP Dowell, however, I do not see where there is anything complaint worthy. VP Dowell has a right and an obligation to be involved with social media posts that are coming out of any of

Most spurious is McLaurin's argument that he raised the issue of discrimination with Justin Mercer, his direct supervisor. *See* Dkt. 29 p. 21. For this contention McLaurin points to a portion of Mercer's deposition in which Mercer testifies as to a time McLaurin confided his frustration that no one was supporting "what he was trying to do at the University." Mercer Dep. 107:1–5. Again, Mercer does not suggest that McLaurin was reporting discrimination or a hostile work environment. Regardless, such watercooler commiseration hardly counts as an attempt to utilize Liberty's antiharassment apparatus.

Finally, McLaurin recounts a meeting with Foster that he requested shortly before resigning his position. In his brief McLaurin claims that his purpose in scheduling this meeting was "to inquire about the legal and institutional protections for employees regarding their sexuality." Dkt. 29 p. 9. According to McLaurin, Foster told him that "if he submitted a legal or institutional complaint regarding [discrimination], he [(Foster)] could not confirm that [McLaurin] would be given any sort of protection." *Id*. at 9–10. However, during discovery Liberty was able to retrieve a recording of this meeting, which was made by McLaurin without Foster's knowledge. *See* Dkt. 26. It is clear from that recording that McLaurin did not at any point report suffering any past improper conduct, discrimination, or harassment—he did not bring up these topics at all. Rather, the meeting consists of McLaurin opening up about being same-sex attracted, Dkt. 31, Ex. A at 0:25–1:05, and requesting assurances that he would not lose his job should he start a personal blog about his life, including his experiences as a gay man, *id*. at 1:25–2:28.

---

the offices he oversees." Dkt. 25, E. 2 p. 29. The Court does not see anything amounting to a Title VII violation in these facts, and thus McLaurin's attempt to "lodge a formal complaint" cannot defeat Liberty's invocation of the affirmative defense.

II

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the Court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. The non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

III

"Employers are not automatically liable for acts of harassment levied by supervisors against subordinates." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 186 (4th Cir. 2001). There must be "some basis for imposing liability on the employer." *Evans v. Intern. Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019). Such a basis is easily found in cases where the supervisor's conduct culminates in a tangible employment action such as hiring, firing, failing to promote, significant job reassignment or a change in benefits. *Vance v. Ball State Univ.*, 570 U.S. 421, 429

(2013). An employer is strictly liable for such decisions "on the premise that the supervisor acted within the scope of his agency." *Spriggs* 242 F.3d at 186. *See also Ellerth*, 524 U.S. at 762 ("[A] tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer.").

However, where, as here, no such action is alleged "[t]he employer may escape liability if it can demonstrate, by a preponderance of the evidence, that (1) it 'exercised reasonable care to prevent and correct promptly any harassing behavior'; and (2) the plaintiff 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm or otherwise.'" *Spriggs* 242 F.3d at 186 (quoting *Ellerth*, 524 U.S. at 765; *Faragher* 524 U.S. at 807). *See also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (en banc) ("The *Ellerth/Faragher* defense, in essence, imposes a duty on the victim to report her supervisor's harassing behavior to the employer.").

Liberty has satisfied its burden with respect to both prongs.

With respect to the first, "the distribution by an employer of an anti-harassment policy provides 'compelling proof that the [employer] exercised reasonable care in preventing and promptly correcting harassment.'" *White v. BFI Waste Services, LLC*, 375 F.3d 288, 299 (4th Cir. 2004) (quoting *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir. 2001)). The undisputed facts show the Liberty had anti-discrimination policies and procedures in place. McLaurin makes no attempt to quarrel with evidence that Liberty accommodated a comprehensive anti-harassment apparatus, as outlined in its employee handbook. *See* Dkt. 25, Ex. 1 p. 26. And he concedes that the procedures for taking advantage of those resources were disseminated and accessible. *See* McLaurin Dep. 219:21–220:18.

Of course, "the 'mere promulgation' of an anti-harassment policy, no matter how ell-conceived, will not suffice to show the requisite level of care where the employer has administered the policy in bad faith or has rendered it ineffectual by acting unreasonably." *Spriggs*, 242 F.3d at 187 (quoting *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999)). In *Spriggs*, for example, the Fourth Circuit found that a rational jury could reject the affirmative defense despite the defendant's promulgation of Title VII complaint procedures because "the company unreasonably failed to correct [the harassing supervisor's] behavior by neglecting to enforce the policy." *Id*. at 188. When the plaintiff in that case attempted to report a claim of racial harassment in accordance with the company's procedures he was met with dismissive, meager attempts at corrective measures. *Id*. As a result, the racial harassment "continued unabated until [the plaintiff] departed." *Id*.

But a plaintiff must offer evidence of this sort—evidence that "the employer adopted or administered the anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional"—to defeat the "compelling proof" of reasonable care supplied by an employer's anti-harassment policy. *Barrett*, 240 F.3d at 266. See also *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 335 (4th Cir. 2011) (citing *Barrett* for the rule that once a defendant employer has offered evidence that it distributed an anti-harassment policy, the burden shifts to the plaintiff to "show by a preponderance of the evidence that the policy was either adopted or administered in bad faith or that it was otherwise defective or dysfunctional."). McLaurin has not offered any such evidence.[4]

---

[4] Evidence of McLaurin's inquiries to Foster about what would happen if he started a blog might be construed as an implicit attempt to show that Liberty's anti-harassment policies were dysfunctional. But the recorded conversation reflects only Foster's inability to predict whether McLaurin would lose his job or otherwise face backlash from the University community. Dkt. 31, Ex. A 9:25–9:31. Foster's inability to forecast the University's reaction to

With respect to the second prong, "proof that a plaintiff employee failed to follow a complaint procedure 'will normally suffice to satisfy the employer's burden under the second element of the defense.'" *Perry*, 184 F.3d at 395 (quoting *Ellerth*, 524 U.S. at 765). Even viewing the evidence in the light most favorable to McLaurin, no reasonable factfinder could conclude that McLaurin reasonably availed himself of the preventive or corrective opportunities provided by Liberty. McLaurin never submitted an official report. McLaurin Dep. 135:4–10. And the *Faragher/Ellerth* safe harbor would be little more than a bromide if McLaurin's complaints about office space, the direction of the department, and general leadership failures were found to be a reasonable attempt to take advantage Liberty's Title VII infrastructure. Nor is McLaurin's unelaborated and uncorroborated deposition testimony sufficient to raise a genuine issue of material fact. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

## IV

McLaurin's Title VII retaliation claim founders on the same ground as his discrimination claims. Title VII makes it unlawful for employers to retaliate against employees because of their opposition to a "practice made . . . unlawful" by Title VII. 42 U.S.C. § 20003-3(a). Thus, to

---

McLaurin's blog is not equivalent to an admission that Liberty's employment protections would be unavailable to McLaurin to address adverse employment consequences should they arise. Moreover, in as much as McLaurin might have argued that his personal take-away from this conversation—that he could not expect to receive employment protection from Liberty—should excuse him of the obligation to report harassment, the Fourth Circuit is clear that "[a]n employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable bases for failing to take advantage of any preventive or corrective opportunities by the employer." *Barrett*, 240 F.3d at 268.

make out a Title VII retaliation claim plaintiffs must identify some act of opposition—some protected activity—for which they were subjected to unlawful retaliation. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (explaining that under either the direct and indirect evidence approach or the *McDonnel-Douglas* burden shifting approach a plaintiff alleging unlawful retaliation under Title VII must show he engaged in protected activity).

McLaurin dedicates a single footnote to the defense of his retaliation claim, wherein he appears to repurpose his complaints against Greg Dowell "to Ron Kennedy, Human Resources and Justin Mercer" to satisfy the protected activity requirement. *See* Dkt. 29 p. 24 n.157. Because the record does not support a finding that these complaints involved opposition to Title VII discrimination, count five will likewise be dismissed.

McLaurin's responsive brief did not address the viability of his last two causes of action at all. The Court thus considers these claims abandoned.[5] *See Parnell v. Supreme Court of Appeals of West Virginia*, 110 F.3d 1077, 1082 n.5 (4th Cir. 1997) (finding claim abandoned in district court where it was contained in the complaint but not briefed or argued). Counts six and seven will also be dismissed.

V

"An employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists under its reasonable procedures." *EEOC v. Xerxes Corp.*, 639 F.3d 658, 674 (4th Cir. 2011) (cleaned up). *See also Boyer Liberto*,

---

[5] The Court notes, however, that the *Faragher/Ellerth* affirmative defense appears to apply equally to hostile work environment claims brought under 42 U.S.C. §1981. *See McKinney v. G4S Government Solutions, Inc.*, 711 Fed. App'x 130, 137 (4th Cir. 2017). The Court also notes that the Virginia Values Act requires plaintiffs to acquire notice of the right to file a private cause of action before doing so. *See* Va. Code § 2.2-3908.

786 F.3d at 282 (explaining that an employee's obligation to report discrimination "is essential to accomplishing Title VII's 'primary objective,' which is 'not to provide redress but to avoid harm.'") (quoting *Faragher*, 524 U.S. at 806). Because McLaurin did not afford Liberty an opportunity to address his allegations, and because he has not alleged any facts that would justify breaching the safe harbor established by *Faragher* and *Ellerth*, the Court will grant Liberty's motion to dismiss.

\* \* \* \*

The Clerk of the Court is hereby directed to send this Memorandum Opinion to all counsel of record.

Entered this __18th__ day of April 2022.

*[signature]*
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE